### THORNTON v. IONIA FREE FAIR ASSOCIATION.

1. NEGLIGENCE— CONTRIBUTORY NEGLIGENCE — INFANTS — PRESUMP-
TIONS.

   Although, under the general rule, children under the age
   of seven years are presumed to be incapable of con-
   tributory negligence, due to assumed lack of experience,
   discretion and capacity to recognize and understand
   danger, age alone is not the conclusive test, but experience
   and capacity are also to be considered.[1]

2. EXPLOSIVES—CONTRIBUTORY NEGLIGENCE—INFANTS—TRESPASSER.

   A 14-year old boy, of average intelligence, who was famil-
   iar with firecrackers, knew how to explode them, and
   understood the attendant dangers, was guilty of con-
   tributory negligence, as a matter of law, when he was
   injured by the explosion of a giant firecracker to which
   he had applied a match for said purpose, and which he
   had found in an inclosure protected by a five-foot woven
   wire fence, within which he was a trespasser.[2]

3. SAME—NEGLIGENCE—INFANTS—NOTICE.

   A fair association was not liable for injuries to a 14-year
   old boy's hand caused by the explosion of a giant fire-
   cracker which he had found about six o'clock in the morn-
   ing in an inclosure used for a fireworks display the night
   before and which was protected by a five-foot woven wire
   fence and a night watchman; said firecracker being one
   which had failed to explode the night before in a fire-
   works display given by a company engaged for that pur-
   pose by the fair association, and the latter having no
   reason to expect that children would invade its premises
   at such an early hour.[3]

[1]Negligence, 29 Cyc. p. 538; [2]Explosives, 25 C. J. § 46 (1926
Anno); [3]Id., 25 C. J. § 26.

On the question of liability for injury to children from ex-
plosives left accessible to them, see notes in 14 L. R. A. (N. S.)
586; 24 L. R. A. (N. S.) 1257; 42 L. R. A. (N. S.) 840; L.
R. A. 1917A, 1295.

The question as to what age the doctrine of contributory
negligence may be applied to children is discussed in a compre-
hensive note in L. R. A. 1917F, 10.

*Continued from Vol. 228.

Error to Ionia; Cross (Orien S.), J., presiding. Submitted April 10, 1924.    (Docket No. 31.)    Decided December 10, 1924.

Case by Ernest Thornton, an infant, by his next friend, against the Ionia Free Fair Association for personal injuries.    Judgment for defendant on a directed verdict.    Plaintiff brings error.    Affirmed.

*Watt & Colwell* (*F. C. Miller,* of counsel), for appellant.

*Fred L. Vandeveer,* for appellee.

STEERE, J.    The Ionia Free Fair Association, defendant, was an unincorporated voluntary association composed of business men of Ionia.    Its officers were a president, secretary, treasurer, and a general manager.    For eight years prior to 1922 it had annually arranged for and held an exposition during August, known and advertised as the "Ionia Free Fair."    Besides exhibitions of farm and fancy stock of all kinds, industrial and mechanical appliances of various descriptions, horse races, fancy riding and driving, etc., the occasion was made more attractive by vaudeville acts, pyrotechnic displays and other special features.    It was held at a public park in the city of Ionia called the "fair grounds," which was owned by the city and generally used throughout the year as a city park free to the public for such recreation as public parks customarily afford.    There was an inclosed race track upon one portion, with a grand stand on the north side of it, opposite which and within the race track was an inclosure with a woven wire fence about five feet high along the north side of the track.    This inclosure was built by the association in 1920 for base ball and other entertainments. The association had the use of the park for its fair purposes, and held its annual free fair there on August

15 to 18, 1922. General notice that it would be held was given by attractive posters and advertisements in newspapers telling, amongst other things, that on each night there would be a fireworks display of an historic spectacle known as Montezuma, given by a fireworks company from Chicago, which would take place opposite the grand stand on the fair ground within the inclosure within the race track.

When this fair was held plaintiff was just past 14 years of age, living on a farm with his grandmother about five miles from Ionia. His father was dead, and he had not seen his mother since she left them when he was about a year old. He had lived some two or three miles from Ionia with his father prior to the latter's death in 1919 and had been taken by him to Ionia on Saturdays. On such occasions he had gone with him to the park for picnics and other recreation, where he was left free to play around the grounds as he saw other children do. He testified that he had attended the free fair with his father, and been within the race track inclosure in front of the grand stand. He had finished five grades in a common school education, and no claim is made that he was in any way mentally or physically defective, or not a normal boy for his age. He had seen the posted notices and read in the papers of the free pageantry spectacle of Montezuma to be given each night of the free fair, in which it was stated that "tons of high explosives and fireworks devices are required for the volcanic eruptions, earthquakes and bombardment which accompany the battle scenes." On the afternoon of the first day of the fair he started on foot for Ionia to see the fireworks, telling his grandmother he would be home that night. He caught a ride part of the way, arriving there about 4 o'clock. In the evening after dark he saw the Montezuma pageantry and accompanying fireworks. After they were over he looked around to see if he could get a

ride home but not finding a chance went over to the horse barn back of the grand stand and slept there that night on some hay.    He testified that he got up the next morning about 6 o'clock and started to go home, but concluded he would go over to the inclosure where the display took place "and see the rigs for the fireworks."    To get there he climbed a board fence, went around the end of the grand stand, across the race track and climbed over the wire fence into the inclosure opposite it.    He then looked around and saw, as he stated, a "long string of small firecrackers and picked them up; I saw another one there, a firecracker, larger one, I picked that up.    I put them inside my overall bib.    I was going to take them home to show the folks."    He further described the string of explosives he picked up as about four feet long, tied at one end to a string on a post and wrapped up in tissue paper, "they had a fuse on them, they were connected together.    They read, I think, 'torpedoes.' " He described the large firecracker he had picked up as "long and round; it was about four inches high and about three inches through," with a string around it and a fuse of which the paper was burned on the end. After picking up these articles and putting them in his bib, he started for home.    On his way he met a young man named Erridge whom he knew, and while they were talking showed him the fireworks he had picked up.    Erridge looked over the string, took one of the explosives off, lit it with a match and threw it in the road where it exploded with a puff of smoke, and said the big explosive plaintiff showed him was a common firecracker.    Plaintiff soon went on towards home until he got to "Prairie Creek," where he said he concluded to get rid of the "big one" because he couldn't get it in his pocket, and thought he "would light it to see what it would do."    He then stood it on end in the road, lit the fuse with a match and stood back some 10 or 15 feet.    He waited as he

said, "what seemed quite a while" to him, then he went to pick it up, saying of what followed:

"I was going to take it and throw it in the creek so nobody would get hold of it.    Just as I picked it up it exploded, went off.    *    *    *    I had put the explosive in the middle of the road; the next thing I knew I was rolling in the ditch.    *    *    *    Then I came to.    I got up and looked at my hand and then I run over to Mrs. Schriner's hollering for help and she came out.    I sat down on the well-curb, they had a cistern there, I sat down on the curb and she washed my hand and called a doctor."

The doctor testified that when he arrived at Mrs. Schriner's plaintiff was on the back porch with his left hand bleeding badly.    He found three fingers of that hand seriously mutilated; the cords were all bruised and lying at different angles "and bone was off."    He also found a bruise on the boy's throat and noticed that he breathed with some difficulty.    The doctor dressed his hand and took plaintiff to Grand Rapids where he was cared for in a hospital for some time.    He lost the three mutilated fingers and it was found necessary to resort to skin grafting before the wound fully healed.

This action is planted on the theory of negligence in leaving dangerous explosives accessible to children without taking proper precautions to safeguard them as the law requires.    Defendant's direct liability is predicated on the proposition that it was primarily responsible for the fireworks display which required the use of dangerous explosives, and its duty to furnish proper protection could not be evaded by turning the matter over to an independent contractor.    Defendant pleaded the general issue, and at close of the testimony its counsel asked a directed verdict on the ground no actionable negligence was shown because plaintiff was guilty of contributory negligence, the display was given by an independent contractor in control of the fireworks and equipped therefor, the place where it

was given was inclosed and withdrawn from the public and plaintiff was a trespasser when he invaded the inclosure and secured the instrumentality by which he injured himself.

In its contract with the fireworks company, which had control of the exhibit and furnished the explosives, defendant agreed to provide the company police protection during the engagement. To that end it employed a night watchman who was on duty there from 7 o'clock in the evening until after 5 o'clock the next morning. The inclosure inside the race track where the exhibit was given had been fenced in for exhibition purposes and men in charge of the fireworks had their tents within the outer inclosure of the race track where they kept their explosives and equipment convenient to the place of exhibit, some of them sleeping there. Plaintiff testified that when he got up that morning he saw people around on the fair grounds, but that when he went around back of the grand stand and climbed over the two fences to get into the place of exhibit there was no one in sight.

Whether, under the conditions shown, negligence can be imputed to defendant for not more closely guarding the inclosure against invasion at that time of day by a youth 14 years of age and, if so, whether his own negligence caused or contributed to the injury and barred recovery, are the questions involved. At close of the testimony the court directed a verdict in favor of defendant on the ground of plaintiff's contributory negligence. Plaintiff's counsel particularly urge in support of their claim of freedom from contributory negligence that he was a country boy living on a farm some distance from the city, inexperienced in fireworks and ignorant of the danger of tampering with high explosives. His own testimony shows the knowledge and experience of at least the average boy of his age in observing and exploding fireworks. He knew what he discovered in the inclosure and carried

away in his bib was unexploded fireworks intended for use in the spectacle he saw the night before where, if according to the notice he had read, tons of high explosives were used for the volcanic eruptions, earthquakes and bombardment which accompanied the battle scene.    He testified to experience with ordinary fireworks since he was 7 years old; that he had owned and exploded firecrackers on the 4th of July, lit Roman candles and sky-rockets (which they put on end in a trough to light) and other things of that kind, including colored lights and torpedoes.    He had seen the various kinds of fireworks displayed in store windows, learned how to break firecrackers in two and light the powder to make what he called "sissers" of the stub to light other firecrackers with, and knew of other boys getting their fingers burned in exploding firecrackers, but said he had never seen fireworks on a large scale, nor knew how they were constructed until he witnessed the Montezuma display the night before the accident.    He knew when he lit the big firecracker that it was a firecracker many times larger than the kind he was familiar with, which sometimes burnt the boys' hands, that it was one of the explosives for use in the display he saw the night before where they portrayed earthquakes and battle scenes, and he knew that it was dangerous.    He was going to throw it in the creek "so nobody would get hold of it," and said the reason he stepped away from it after he lit the fuse was because—

"I was afraid if I got too close to it it would burn or scorch my face and hands.
"Q. Probably put your eyes out?
"A. Yes, sir.
"Q. That is the reason you stepped back?
"A. Yes, sir.  *  *  *
"Q. You know of course firecrackers contain explosives.
"A. Yes, sir.
"Q. And powder?

"*A.* Yes, sir.

"*Q.* And when they go off they go off suddenly and create a great noise?

"*A.* Yes, sir.    \*    \*    \*

"*Q.* The reason of that is because so many people were injured on the 4th by having firecrackers explode and injure them?

"*A.* Yes, sir.    \*    \*    \*

"*Q.* When you lit it you did not know what might happen, whether noise, explosion or a display of aerial fireworks?

"*A.* No, sir.

"*Q.* The purpose of lighting it was to see just what would happen?

"*A.* Yes, sir.

"*Q.* You anticipated there would be danger from it and for that reason you took yourself some 10 or 15 feet from it?

"*A.* Yes, sir.    \*    \*    \*

"*Q.* You also recognized that on this particular week that a certain portion of the grounds had been withdrawn and were being used for other purposes, such as a fireworks display?

"*A.* Yes, sir.    \*    \*    \*

"*Q.* When I used the expression 'withdrawn,' that you knew that a certain portion of the park had been withdrawn from the general use of the public, for use for a fireworks display place, what do you understand?

"*A.* It had been separated from the rest.

"*Q.* It was set aside for the fireworks display, but the rest of the premises was to be used by the public?

"*A.* Yes, sir.

"*Q.* You considered yourself one of the public?

"*A.* Yes, sir."

It would scarcely be contended that an adult, manifesting no more intelligence, experience and knowledge of the danger than plaintiff, who did the same things and injured himself in the same way, could hold others responsible for what befell him.    Plaintiff was not a little child with knowledge and experience limited to childish things.    He was 14 years old, had reached the age of adolescence, knew right from wrong, knew

the place he went out of his way and climbed over two fences to invade had been withdrawn from public use that week, that the giant firecracker which he could not get in his pocket and carried away in his bib had not been exploded.   When he later lit its fuse, though not knowing as he stated what might happen, he stepped away from it some distance anticipating "there would be danger from it."   He knew firecrackers were exploded by lighting a fuse followed by an interval of time before the explosion, and that he was tampering with one of unusual size, "about four inches high and about three inches through."   He was confronted with no emergency.   Having the age, intelligence and experience to know and understand the explosive and dangerous qualities of fireworks generally, and of firecrackers of ordinary size in particular, he ran the risk of picking up this one after lighting it, to throw it in the creek, and so voluntarily exposed himself to an imminent known danger.

Plaintiff had passed the years of tender childhood which is protected from contributory negligence by the presumption thrown around its assumed lack of experience, discretion and capacity to recognize and understand danger.   The general rule imputes that lack of capacity up to the age of seven years, and some courts have applied it as a *prima facie* presumption until the age of 14 is reached, putting the burden of proof on those claiming contributory negligence. But age alone is not the conclusive test.   Experience and capacity are also to be considered.   As was said in *Trudell* v. *Railway Co.*, 126 Mich. 73 (53 L. R. A. 271) where the injured child was 7 years and 4 months old, "Age is not the true test in such cases.   It is the intelligence of the boy, not his age, that must control."   By the tests of capacity and experience children younger than 7 years have been held guilty of contributory negligence as a matter of law under the undisputed facts (*Hayes* v. *Norcross*, 162 Mass.

546 [39 N. E. 282]). In *Ecliff* v. *Railway Co.*, 64 Mich. 196, it was held that the fact a boy 12 years old of ordinary intelligence for his age is more venturesome, and therefore not as cautious as a man in the face of danger, cannot of itself excuse him from contributory negligence.

Plaintiff's counsel cite and urge as directly in point *Olson* v. *Investment Co.*, 58 Wash. 151 (108 Pac. 140, 27 L. R. A. [N. S.] 884). In that case plaintiff was a boy about 13 years of age who lost his hands while trying to pry the cap from a stick of dynamite purloined from an outbuilding where defendant had stored it. Defendant was a real estate company in the city of Tacoma engaged in selling an addition to the city, being itself the owner of four unfenced lots located at the intersection of two streets. Several residences in which children lived, and a public schoolhouse, were located in that vicinity. Plaintiff with other school boys was in the habit of playing on the vacant lots in that addition. Defendant had commenced construction of a cement building on its property and about 30 feet from the street had erected a small structure for toilet purposes with a board screen in front of the unlocked toilet door. A pile of sand for its building purposes was also placed near the toilet. The school boys who played on those vacant lots occasionally visited and used the unlocked toilet, as did others. Some time before the accident in question defendant's manager had caused a box and several loose sticks of Hercules stumping powder, called by the witnesses dynamite, to be stored on a shelf or plate in this unlocked outbuilding, above and within reach from the toilet seat, in violation of a city ordinance relative to storing and guarding dangerous explosives. The school boys who played around there soon discovered the explosives and surreptitiously took away one or more of the sticks of dynamite with some caps and fuse. On the day of the accident five of the

boys, including plaintiff, took a stick of the dynamite with a fuse and some caps to a vacant property about a quarter of a mile distant and tried to explode it under a stump. Plaintiff had attached a fuse and cap to it and they first tried to cause the explosion by lighting it with a match which failed, and then tried some burning paper, dodging behind large stumps after doing so. These efforts being unsuccessful plaintiff eventually took the stick of dynamite and attempted to pry off the cap which resulted in an explosion seriously injuring him as stated. Taking into consideration his tender age (13 years) and lack of knowledge that what he did would cause an explosion the court apparently applied the rule of a dangerous nuisance attractive to children of tender years, as developed in the turn-table cases, and declined to find as a conclusion of law that plaintiff was guilty of contributory negligence. In the instant case plaintiff was 14 years of age, and knew that just what he did with the giant firecracker customarily caused an explosion with fireworks of that character. Unquestionably the older and better informed the youth or child the less reason there is for permitting recovery. Upon that subject it is said in 20 R. C. L. p. 87:

"Some perils, such for example as fire or open water, must be obvious even to the most immature intellect. On the other hand, seldom will a recovery be allowed for injuries to boys of fourteen, thirteen or even twelve years of age, unless they are shown to have been of inferior intelligence. The truth of the matter seems to be that the turn-table doctrine furnishes justification for a recovery by children who have gotten old enough to go about unattended but are yet unaware of the perils embodied by machinery and other instrumentalities of an artificial nature—the period between the ages of five and ten."

Of defendant's negligence in the *Olson Case* that court said in part:

"It is manifest that the boys repeatedly went upon the lots to the appellants' knowledge. This being true, we think the evidence is sufficient to show that the appellants were guilty of the grossest and most culpable negligence in storing the dynamite as they did, concededly in violation of a city ordinance, and in leaving a door unlocked in a locality where, as they knew, the boys frequently went, whether as trespassers or otherwise. They knew the dynamite was a dangerous agency. There is no evidence that they were then using it, or that they intended to use it in the immediate future, or that they would need it at any time. The evidence rather indicates that the dynamite was unlawfully stored and left for an indefinite time in an unlocked vacant structure, where the appellants must have known the children were liable to be, either as trespassers or otherwise. * * * Here the appellants, having no apparent use for the dynamite, and knowing of the trespassing proclivities of the boys, needlessly stored it, a most dangerous agency where, in the exercise of ordinary prudence, they should have anticipated the trespassing boys would readily find, be attracted by, and take it."

It is indicated that the doctrine of gross negligence in that jurisdiction is not entirely harmonious with views expressed in *Gibbard* v. *Cursan*, 225 Mich. 311; but, be that as it may, no such acts of "grossest and most palpable negligence" as the court there found and dwelt upon can be imputed to defendant in this case. The inclosure plaintiff succeeded in entering unobserved had, as he knew, been withdrawn from public use for the fireworks displays during the fair. Men in charge of it remained on the grounds within the race track inclosure and a watchman patrolled the place during the night. Defendant had no knowledge or notice or reason to expect that unattended children of such tender age as to be immune from negligence would be abroad at that early hour in the morning and likely to surreptitiously invade the place. There was certainly no implied invitation, or permission, for children of any age to visit the inclosure, nor reason

to anticipate they might be abroad at that time for such a purpose.

For the foregoing reasons the judgment will stand affirmed.

CLARK, C. J., and MCDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.